IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS
EASTERN DIVISION

| | |
|---|---|
| CHRISTOPHER J. FIORENTINO,<br><br>   Plaintiff,<br>v.<br><br>FLOSPORTS, INC.,<br><br>   Defendant. | Case No. 1:22-CV-11502-AK |

**JOINT DECLARATION OF RACHEL GEMAN AND HANK BATES
IN SUPPORT OF PLAINTIFF'S (I) MOTION FOR FINAL APPROVAL
OF CLASS ACTION SETTLEMENT, AND (II) MOTION FOR ATTORNEYS' FEES,
LITIGATION COSTS, AND SERVICE AWARD**

We, Rachel Geman and Hank Bates jointly declare and state as follows:

1. Rachel Geman is an attorney duly licensed to practice law in the State of New York, who is admitted *pro hac vice* to practice before this Court. *See* Doc No. 13. Ms. Geman is a partner at the law firm Lieff Cabraser Heimann & Bernstein, LLP ("LCHB") and serves as co-counsel of record for Plaintiff Christopher J. Fiorentino ("Plaintiff") in the above-captioned case (the "Action").

2. Hank Bates is an attorney duly licensed to practice law in the States of California and Arkansas who is admitted *pro hac vice* to practice before this Court. *See* Doc No. 19. Mr. Bates is a partner at Carney Bates & Pulliam, PLLC ("CBP") and also serves as co-counsel of record for Plaintiff.

3. Throughout this litigation, we and our respective law firms have been primarily responsible for the prosecution of Plaintiff's claims on behalf of the proposed Settlement Class.

1

We were joined by attorneys at the law firms of Burns Charest LLP ("BC"), Herrera Kennedy LLP ("HK"), and Cera LLP ("Cera"), who also serve as counsel of record for Plaintiff in the Action. Specifically, we worked in collaboration with those attorneys to represent the interests of Plaintiff and the proposed Settlement Class.

4. We make this Joint Declaration in support of Plaintiff's (i) Motion for Final Approval of Class Action Settlement, and (ii) Motion for Award of Attorneys' Fee, Litigation Costs, and Service Award. Except where otherwise stated, we each have personal knowledge of the facts set forth in this Joint Declaration based on active participation in all aspects of the prosecution and resolution of the Action. If called upon to testify, we each could and would testify competently to the truth of the matters stated herein.

5. Attached hereto as **Exhibit A** is the Declaration of Christopher J. Cormier of Burns Charest LLP.

6. Attached hereto as **Exhibit B** is the Declaration of Shawn M. Kennedy of Herrera Kennedy LLP.

7. Attached hereto as **Exhibit C** is the Declaration of C. Andrew Dirksen of Cera, LLP.

8. Attached hereto as **Exhibit D** is the Declaration of Christopher J. Fiorentino.

9. Attached hereto as **Exhibit E** is the Declaration of Ozge Erturk.

### Overview of the Litigation and Settlement

10. Plaintiff filed this case on behalf of himself and other subscribers of FloSports on September 13, 2022, alleging one claim for violation of the Video Privacy Protection Act, 18 U.S.C. § 2710 ("VPPA"). Doc No. 1. After FloSports moved to dismiss the original complaint

(Doc No. 37), Plaintiff filed an amended complaint on November 23, 2022. Doc No. 46 ("Amended Complaint" or "Am. Compl.").

11. As alleged in Plaintiff's Amended Complaint, FloSports, a subscription-based digital video streaming service, intentionally installed the Facebook Pixel ("Pixel") on its website and selected the specific types of information the Pixel would capture and transmit. *Id*. ¶¶ 2, 4–6, 24–28, 60. FloSports also knowingly configured the Pixel such that when a subscriber views a particular video on its website, FloSports sends to third party Meta Platforms, Inc. ("Meta") the subscriber's personally identifiable information ("PII"), including (a) the title and URL of the video, and (b) the subscriber's Facebook ID (or "FID"). *Id*. ¶¶ 20, 27–35.

12. Subsequent to the filing of the Amended Complaint, the Parties jointly filed a motion to stay the case pending completion of formal mediation, which the district court granted on January 18, 2023. Doc No. 52.

13. On April 24, 2023, the Parties participated in a full-day mediation session before the Honorable Wayne R. Andersen (Ret.).

14. As further detailed in our Joint Declaration filed in support of Plaintiff's Motion for Preliminary Approval of Class Action Settlement ("Joint Decl. Re: Preliminary Approval") (Doc No. 60-2), while the Parties were unable to reach a resolution on that day, they engaged in additional rounds of arms' length negotiations facilitated by Judge Andersen, and, on May 26, 2023, the Parties agreed to and executed a term sheet for the resolution of Plaintiff's claim.

15. Thereafter, the Parties proceeded to negotiate and draft a comprehensive set of settlement papers, which were finalized and executed on July 21, 2023. *See* Doc No. 60-1 ("Settlement").

16.     The resulting Settlement secures an excellent recovery for the Settlement Class. Pursuant to the Settlement, Defendant will establish a non-reversionary cash Settlement Fund in the amount of $2,625,000. Settlement Class Members will be entitled to submit claims against the Settlement Fund. All Settlement Class Members who submit a valid claim will be entitled to a *pro rata* portion of the Settlement Fund after payment of Settlement Administration Expenses, attorneys' fees and costs, and any service award, if approved by the Court.

17.     In addition to the monetary relief, the Settlement requires FloSports to, within 45 days of the Preliminary Approval Order, suspend operation of the Facebook Tracking Pixel on any pages on its website that both include video content and have a URL that substantially identifies the video content viewed, unless and until the VPPA is amended, repealed, or otherwise invalidated, or until Defendant obtains VPPA-compliant consent for the disclosure of the video content viewed to Facebook.

18.     On July 26, 2023, Plaintiff filed a Notice and Motion for Preliminary Approval of the Settlement (Doc No. 59) along with a supporting memorandum of law (Doc No. 60). After a hearing on August 23, 2023, the Court granted preliminary approval of the Settlement (Doc No. 63 ("PAO")).

19.     Following entry of the Court's PAO, the Settlement Administrator, Epiq, began implementation of the court-approved Notice Plan, and Class Counsel has worked with Epiq to effectuate the court-ordered Notice Plan. Class Counsel has also worked with Epiq on a weekly basis to monitor settlement claims and any other issues that may arise.

20.     To expound, on August 4, 2023, Epiq disseminated 57 CAFA Notice Packages ("CAFA Notice") as required by the federal Class Action Fairness Act of 2005 (CAFA), 28 U.S.C. § 1715. Declaration of Cameron R. Azari, Esq. on Implementation of Notice Plan and Notices

("Azari Decl.") at ¶ 8. Thereafter, on October 6, 2023, Epiq sent 784,760 Email Notices ("Initial Email Notice") to identified potential Settlement Class Members for whom a valid email address was available, established a dedicated website for the Settlement with the URL www.flosportsvppasettlement.com (the "Settlement Website"), and established a toll-free telephone number (1-877-619-4778) for the Settlement. *See id*. at ¶¶ 15-16, 24-28.

21. However, as noted in the Parties' Joint Motion for Extension of Deadlines (Doc No. 64), in disseminating the Initial Email Notices, Epiq received an unusually high percentage of "bounce-back" notifications coming from one email service provider—Google/Gmail. In an effort to resolve the issue, Epiq initiated a remediation request with Google. Because that remediation request was still pending on November 5, 2023, the Parties moved for and were granted a short extension to enable Epiq to resolve its pending remediation request with Google and/or to implement a supplemental notice effort. *See id*.; *see also* Doc No. 65.

22. Epiq did not receive a response from Google to its multiple remediation request. Azari Decl. at ¶ 11. Consequently, Epiq and the Parties met and conferred and all agreed to proceed with a supplemental notice campaign.

23. On this front, Epiq created a new domain name, and on November 15, 2023, Epiq sent 193,699 Email Notices ("Subsequent Email Notice") to those email addresses that were previously undeliverable (specifically Google/Gmail email addresses). *Id*. at ¶¶ 12, 15. The Email content was updated to provide the extended deadlines, etc. *Id*. at ¶ 15 and Attachment 3 thereto.

24. Through Epiq's initial and supplemental email notice efforts, individual notice has reached approximately 97.2% of the identified potential Settlement Class Members. *Id*. at ¶ 18.

25. In conjunction with the additional email notice efforts, the Notice Plan was supplemented with an online media campaign using banner ads displayed on the Google Display

Network (the "Digital Notice"). *Id.* at ¶ 20. The Digital Notices, which ran from November 15, 2023 through November 29, 2023, were targeted to a select audience, and included a List Activation campaign, which matched the undeliverable email addresses for potential Settlement Class Members to online profiles with Google, and then served Digital Notices directly to those individuals. *Id.* at ¶¶ 20–23. In brief, through the List Activation campaign, Google matched to 195,719 potential Settlement Class Member with an undeliverable email address and was able to deliver 626,462 impressions to 144,981 of these matched individuals. *Id.* at ¶ 23. Thus, the Digital Notices further enhanced the notice reach.

26.  The content of the court-approved notices provided Settlement Class Members a detailed summary of the relevant information about the Settlement, including, among other things: (1) a plain and concise description of the nature of the Action and the proposed Settlement; (2) the right of Settlement Class Members to request exclusion from, or object to, the Settlement and the deadline for doing so; (3) the process for submitting a claim form and the deadline for doing so; (4) specifics on the date, time and place of the Final Fairness Hearing; and (5) information regarding Class Counsel's anticipated fee application and the anticipated request for the Class Representative's service award. *See id*. ¶¶ 15-16, 23-24 & Exs. 2–8.

27.  Class Counsel will provide an update on implementation of the Notice Plan, report on any opt outs, and respond to any substantive objections by February 16, 2024, at which time Class Counsel will also provide a proposed final approval order and judgment for the Court's consideration.

28.  The court-approved Notice Plan also permits Epiq, at the election of Class Counsel, to send one to two reminder notices via email to Settlement Class Members at least seven calendar days before the end of the claims submission period. Settlement at ¶ 4.1.3.

29.     Class Counsel anticipates that at least one reminder E-Mail Notice will be sent to provide a second chance to potential Settlement Class Members who (i) read the initial E-mail Notice but forgot or failed to submit a claim due to the hectic ongoings of life, or (ii) for whatever reason did not open, view, or receive the initial E-mail Notice. *See also* Azari Decl. at ¶ 19.

### Factors Supporting Final Approval

30.     The Settlement provides for both monetary and injunctive relief for the benefit of the Settlement Class. As for the monetary relief, the Settlement provides for a cash common fund in the amount of $2.625 million for the benefit of the Settlement Class. As for the injunctive relief, the Settlement provides for important business practice changes designed to remediate the alleged VPPA violations going forward, namely the Settlement requires FloSports to suspend operation of the Pixel on each page of its website that both includes video content and has a URL that identifies the video content viewed. The injunctive relief has already been implemented by FloSports (*see* Ex. E hereto) and shall remain in place unless and until the VPPA were to be: (a) amended to expressly permit (and not prohibit) the Released Claims, (b) repealed, or (c) invalidated by a judicial decision on the use of website pixel technology by the United States Supreme Court or the First Circuit Court of Appeals. Thus, the benefits achieved through the Settlement are substantial and extend well beyond the dollar figure representing the common fund.

31.     The Parties agreed to the terms of the Settlement through experienced counsel who possessed all the information necessary to evaluate the case, determine all contours of the proposed class, and reach a fair and reasonable compromise after negotiating the terms of the Settlement at arms'-length and with the assistance of a neutral mediator.

32.     Class Counsel have invested significant time and resources into this action. Class Counsel performed such task as: (i) conducting a thorough pre-suit investigation that resulted in

the preparation of a detailed complaint; (ii) analyzing the legal arguments raised in FloSports' motion to dismiss and preparing an amended complaint; (iii) gathering Plaintiff's documents and relevant information; (iv) preparing mediation statements; (v) requesting and reviewing relevant informal discovery during mediation; (vi) participating in in a full-day mediation followed by post-mediation negotiations; (vii) achieving a very favorable Settlement on behalf of the Settlement Class; and (viii) negotiating comprehensive settlement papers.

33. From the outset of the case, Plaintiff and Class Counsel recognized that the case presented substantial and novel litigation risks. For example, in its motion to dismiss, Defendant contends that: (i) it is not a "video tape service provider" within the meaning of the VPPA; (ii) the information it allegedly disclosed to Facebook does not constitute PII within the meaning of the VPPA; and (iii) any disclosures of PII to Facebook were not made by Defendant "knowingly," as required by the VPPA. *See* Doc No. 16 at 8-16. An adverse decision on any of these contentions would deprive Plaintiff and the Settlement Class of any recovery whatsoever.

34. Additionally, other Facebook Tracking Pixel-based VPPA cases have failed at the motion to dismiss stage. *See, e.g., Gardener v. MeTV*, 2023 WL 4365901, at *5 (N.D. Ill. July 6, 2023) (granting the motion to dismiss and "find[ing] dispositive MeTV's argument that Plaintiffs are not consumers under the Act"); *Carter v. Scripps Networks, LLC*, 2023 WL 3061858, at *6 (S.D.N.Y. Apr. 24, 2023) (granting motion to dismiss because "[t]he Complaint describes plaintiffs as subscribers of hgtv.com newsletters, but does not plausibly allege that they were subscribers of hgtv.com video services"); *Martin v. Meredith Corp.*, 2023 WL 2118074, at *3 (S.D.N.Y. Feb. 17, 2023) ("The plaintiff's VPPA claim is dismissed because the complaint itself shows that the defendants do not disclose information showing that a person has 'requested or obtained specific video materials or services.'"); *Hunthausen v. Spine Media, LLC*, 2023 WL

4307163, at *3 (S.D. Cal. June 21, 2023) (granting motion to dismiss because "[r]enting, purchasing or subscribing for goods or services from a third party connected to a [video tape service provider] is insufficient to make someone a 'consumer' under the VPPA"); *Cantu v. Tapestry, Inc.*, 2023 WL 4440662, at *10 (S.D. Cal. July 10, 2023) ("[T]he Court finds Plaintiff has failed to state a claim on the basis that he has not properly alleged that Defendant is a 'video tape service provider.'"); *Carroll v. General Mills, Inc.*, 2023 WL 4361093, at *3 (C.D. Cal. June 26, 2023) (granting motion to dismiss because "[p]laintiffs do not allege any facts suggesting that the delivery of audiovisual material is General Mills' particular field of endeavor or that General Mills' products are specifically tailored to serve audiovisual material").

35. Notably, similar Pixel and VPPA cases have failed at the class certification and summary judgment stages of the litigation. *See, e.g., Doe v. Medstar Health, Inc.*, 23-C-20-000591, Dkt. Nos. 70-71, at p. 1 (Md. Cir. Ct. 2023) (denying a motion for class certification in Pixel case); *In re Hulu Priv. Litig.*, 86 F. Supp. 3d 1090, 1097 (N.D. Cal. 2015) (denying a motion for summary judgment in VPPA Facebook cookie case because "there [was] no evidence that Hulu knew that Facebook might combine a Facebook user's identity (contained in the c_user cookie) with the watch-page address").

36. Defendant also is represented by highly experienced attorneys who made clear that absent a settlement, they were prepared to continue their vigorous defense of this case and would continue to challenge liability.

37. Class Counsel are also aware that Defendant would oppose class certification vigorously, and that Defendant would prepare a competent defense at trial. Looking beyond trial, Plaintiff is aware that Defendant could appeal the merits of any adverse decision, and that in light of the statutory damages in play, it would argue – in both the trial and appellate courts – that the

award of any statutory damages is not warranted or for a reduction of damages based on due process concerns, resulting in delay, added costs, and a potentially overturned verdict.

38. While confident in Plaintiff's claims, Class Counsel acknowledges that the outcome of trial and obtaining a recovery larger than that obtained through settlement is an uncertainty. For example, in *In re Apple Computer Sec. Litig.*, No. C-84-20148-(A)-JW, 1991 WL 238298 (N.D. Cal. Sept. 6, 1991), the jury rendered a verdict in favor of plaintiffs and found recoverable damages in excess of $100 million. Nonetheless, the trial court disagreed and overturned the verdict, entering a judgment notwithstanding the verdict for the individual defendants and ordering a new trial with regard to the corporate defendant. *Id.*

39. The injunctive relief obtained through the Settlement is the same injunctive relief that Plaintiff would have sought and achieved through trial, if successful.

40. Plaintiff and Class Counsel believe that the monetary and injunctive relief provided by the Settlement weighs heavily in favor of a finding that the Settlement is fair, reasonable, and adequate, and well within the range of approval.

41. Since the Court entered its PAO, Class Counsel has worked with Epiq to carry out the Court-approved Notice Plan. As detailed in the Azari Declaration, it is estimated that notice has reached approximately 97.2% of the Settlement Class. *Id.* at ¶¶ 7, 18, 33. A 97.2% notice reach is an excellent result and certainly reasonable. *See In re Packaged Seafood Prod. Antitrust Litig.*, No. 15MD2670 DMS(MDD), 2023 WL 2483474, at *2 (S.D. Cal. Mar. 13, 2023) ("The Federal Judicial Center has concluded that a notice plan that reaches at least 70% of the class is reasonable." (citing *Chinitz*, 2020 WL 7042871, at *2, 2020 U.S. Dist. LEXIS 224999, at *5 and Fed. Jud. Ctr., *Judges' Class Action Notice and Claims Process Checklist and Plain Language Guide* 3 (2010)).

42. The current deadline to object to the Settlement is January 12, 2024. To date, neither Epiq nor Class Counsel have received an objection to the Settlement. *See* Azari Decl. at ¶ 29.

43. The current deadline to opt-out of the Settlement is also January 12, 2024. To date, there have been zero requests for exclusion from the Settlement. *Id*.

44. As noted in paragraph 26 above, Class Counsel will provide an update on implementation of the Notice Plan, report on any opt outs, and respond to any substantive objections by February 16, 2024, at which time Class Counsel will also provide a proposed final approval order and judgment for the Court's consideration.

45. Class Counsel have significant experience in litigating class actions of similar size, scope, and complexity to the instant action. Class Counsel regularly engage in major complex litigation involving consumer privacy, have the resources necessary to conduct litigation of this nature, and have frequently been appointed lead class counsel by courts throughout the country. *See* Joint Decl. Re: Preliminary Approval at ¶¶ 27–44 & Exs. 2–3.

46. Based on Class Counsel's experience litigating similar class actions, Class Counsel is of the opinion that the Settlement is fair, reasonable, and adequate, and in the best interests of the Settlement Class.

47. As discussed above and throughout Plaintiff's Motion for Final Approval of Class Action Settlement, the Settlement reached in this case was the product of negotiations conducted at arms' length by experienced counsel representing adversarial parties with the assistance of a neutral mediator. Thus, there is absolutely no evidence of fraud or collusion.

48. Further, there are no separate agreements to be identified pursuant to Federal Rule of Civil Procedure 23(e)(3).

49. Class Counsel is of the opinion that Plaintiff's active involvement in this case was critical to its ultimate resolution. He took his role as class representative seriously, devoting significant amounts of time and effort to protecting the interests of the Class. Without his willingness to assume the risks and responsibilities of serving as Class Representative, we do not believe such a favorable result could have been achieved.

**Factors Supporting an Award of Attorneys' Fees, Litigation Costs, Service Award**

50. Despite the clear risks involved in pursing this litigation (*see supra*), Class Counsel undertook this matter on a contingency basis with no guarantee of recovery and have committed substantial resources of attorney and staff time, in addition to out-of-pocket costs, towards investigating, litigating, and settling the matter. In doing so, Class Counsel also assumed the risk of the significant delay associated with achieving a final resolution through trial or any appeals.

51. The Parties agreed to the terms of the Settlement through experienced counsel who possessed all the information necessary to evaluate the case, determine all the contours of the proposed class, and reach a fair and reasonable compromise after negotiating the terms of the Settlement at arm's length and with the assistance of a neutral mediator. As noted in paragraph 45 above, Class Counsel have significant experience in litigating class actions of similar size, scope, and complexity to the instant action. *See* Joint Decl. Re: Preliminary Approval at ¶¶ 27–44 & Exs. 2–3.

52. FloSports has presented a vigorous defense throughout the litigation and has been represented by highly experienced lawyers from Holland & Knight, LLP, a well-respected law firm with more than 2,200 attorneys practicing in over 250 areas. *See* https://www.hklaw.com. Notwithstanding this formidable opposition, Class Counsel developed a strong case and negotiated settlement terms that are highly favorable to Settlement Class Members. *See Schwartz v. TXU*

*Corp.*, No. 3:02-CV-2243-K, 2005 WL 3148350, at *30 (N.D. Tex. Nov. 8, 2005) ("The ability of plaintiffs' counsel to obtain such a favorable settlement for the Class in the face of such formidable legal opposition confirms the superior quality of their representation.").

53. Plaintiff and Class Counsel recognize that despite our belief in the strength of Plaintiff's claims, the expense, duration, and complexity of protracted litigation would be substantial and the outcome uncertain. Indeed, as identified above, the arguments raised by Defendant in its motion to dismiss, the uncertainties of the VPPA claims and maintaining a class throughout trial and appeal or surviving summary judgment, as well as the financial condition of FloSports posed real and immediate risks to this litigation.

54. Absent a settlement, the success of Defendant's various defenses, coupled with Defendant's financial condition, could deprive Plaintiff and the Settlement Class Members of any potential relief whatsoever.

55. Class Counsel have expended substantial time and effort in the litigation and settlement of this Action. Collectively, based on their audited time records, Class Counsel have devoted 779.50 hours, yielding a lodestar of $592,256.50.

56. The following table summarizes Class Counsel's reasonable lodestar:

| Firm | Hours | Lodestar |
|---|---|---|
| LCHB | 325.6 | $236,490.50 |
| CBP | 252.60 | $199,186.00 |
| BC[1] | 146.8 | $111,285.00 |
| HK[2] | 50.0 | $44,695.00 |
| Cera[3] | 4.5 | $3,600.00 |
| **Total** | **779.50** | **$592,256.50** |

---

[1] *See* Ex. A hereto.
[2] *See* Ex. B hereto.
[3] *See* Ex. C hereto.

57. In performing the audit of Class Counsel's time records and in the exercise of their discretion, Class Counsel excluded, *inter alia*, the following categories of time entries: (i) duplicative, unnecessary, or irrelevant time entries; (ii) time entered by timekeepers who recorded a *de minimis* amount of time; and (iii) time spent in connection with the preparation of Plaintiff's Motion for Attorneys' Fees. As a result, the lodestar forming the basis for Plaintiff's request for attorneys' fees does not include substantial past and future time committed to the litigation of this Action, including time to be spent obtaining final approval and overseeing implementation of the Settlement.

58. Furthermore, over the course of litigation, Class Counsel took reasonable efforts to minimize inefficiency and to prevent the duplication of work. Generally speaking, tasks were assigned with clear instructions by lead counsel, to avoid duplication of efforts and to ensure that appropriately skilled personnel performed each task. Class Counsel also routinely communicated with each other to monitor progress and ensure that tasks were being performed in a timely and effective manner.

59. Based on Class Counsel's lodestar to date in this action, the requested fee yields a 1.48 multiplier, which is directly in line with multipliers approved in this district. *See Bettencourt v. Jeanne D'Arc Credit Union*, No. 17-CV-12548-NMG, 2020 WL 3316223, at *3 (D. Mass. June 17, 2020) (finding multiplier of 1.20 was "well within the range of multipliers typically allowed by this Court (1x to 2.7x)"); *Roberts*, 2016 WL 8677312, at *13 (court approved a multiplier of 1.96); *Bacchi v. Massachusetts Mut. Life Ins. Co.,* No. CV 12-11280-DJC, 2017 WL 5177610, at *5 (D. Mass. Nov. 8, 2017) (approving multiplier of 1.31); *New England Carpenters Health Benefits Fund v. First Databank, Inc.*, 2009 WL 2408560, at *2 (D. Mass. Aug. 3, 2009) (approving lodestar multiplier of about 8.3); *In re AMICAS, Inc. S'holder Litig.*, 2010 WL

5557444, at *4 (Mass. Super. Dec. 6, 2010), *judgment entered sub nom. In re Amicas, Inc. S'holder Litig.* (Mass. Super. 2010) (approving lodestar multiplier of 5); *In re Relafen*, 231 F.R.D. at 82 (noting that multipliers have ranged from 1.0 to 4.0 and concluding that a multiplier of 2.02 was appropriate)).

**LCHB's Reasonable Lodestar and Litigation Costs.**

60. Only Ms. Geman attests to the facts set forth in this Section.

61. I have personal knowledge of the hourly rates charged by LCHB attorneys and support staff included in the exhibits to this declaration. The hourly rates for the attorneys and professional support staff in my firm are the usual and customary rates set by the firm for each individual. These hourly rates are the same as, or comparable to, the rates accepted by courts in other class action litigation including courts in this Circuit. My firm's rates are set based on periodic analysis of rates charged by firms performing comparable work and that have been approved by courts in other class actions within this Circuit and nationwide. Different timekeepers within the same employment category (*e.g.*, partners, associates, paralegals, etc.) may have different rates based on a variety of factors, including years of practice, years at the firm, year in the current position (*e.g.*, years as a partner), relevant experience, relative expertise, and the rates of similarly experienced peers at our firm or other firms.

62. Attached hereto as **Exhibit F** is a true and correct summary lodestar chart that reflects, for each LCHB timekeeper: (i) their title or position (*e.g.*, partner, associate, staff attorney, paralegal); (ii) the total number of hours they worked; (iii) their current hourly rate; and (iv) their lodestar. For attorneys or support staff who no longer work with LCHB, the current hourly rate is the rate for that individual in his or her final year of work with the firm.

63. I am prepared to provide the Court with any further documentation or explanation regarding LCHB's lodestar, including detailed daily time records, upon request by the Court.

**CBP's Reasonable Lodestar and Litigation Costs**.

64. Only Mr. Bates attests to the facts set forth in this Section.

65. I have personal knowledge of the hourly rates charged by CBP attorneys and support staff included in the exhibits to this declaration. The hourly rates for the attorneys and professional support staff in my firm are the usual and customary rates set by the firm for each individual. These hourly rates are the same as, or comparable to, the rates accepted by courts in other class action litigation including courts in this Circuit. My firm's rates are set based on periodic analysis of rates charged by firms performing comparable work and that have been approved by courts in other class actions within this Circuit and nationwide. Different timekeepers within the same employment category (*e.g.*, partners, associates, paralegals, etc.) may have different rates based on a variety of factors, including years of practice, years at the firm, year in the current position (*e.g.*, years as a partner), relevant experience, relative expertise, and the rates of similarly experienced peers at our firm or other firms.

66. Attached hereto as **Exhibit G** is a true and correct summary lodestar chart that reflects, for each CBP timekeeper: (i) their title or position (*e.g.*, partner, associate, staff attorney, paralegal); (ii) the total number of hours they worked; (iii) their current hourly rate; and (iv) their lodestar. For attorneys or support staff who no longer work with CBP, the current hourly rate is the rate for that individual in his or her final year of work with the firm.

67. I am prepared to provide the Court with any further documentation or explanation regarding CBP's lodestar, including detailed daily time records, upon request by the Court.

**Class Counsel's Reasonably Incurred Litigation Costs**

68.     Over the course of the litigation, Class Counsel kept records of all litigation expenses. The following table summarizes Class Counsel's reasonably incurred litigation expenses:

| Expense Category | Amount |
|---|---|
| Mediation Services | $16,225.50 |
| Experts/Consultants | $2,162.26 |
| Filing and Pro Hac Vice Fees | $1,402.00 |
| Federal Express/Courier | $156.92 |
| Computer Research | $1,644.75 |
| Travel | $768.77 |
| Photocopying/Printing | $12.24 |
| Telephone Conferencing Services | $9.25 |
| **Total** | **$22,381.69** |

69.     With the assistance of attorneys and staff working under our direction and supervision, we conducted a comprehensive audit of all litigation expenses incurred by Class Counsel in the prosecution of this Action. In performing the audit of Class Counsel's litigation expenses, we exercised our discretion in removing any expenses we considered unnecessary or irrelevant.

70.     We are prepared to provide the Court with any further documentation or explanation regarding Class Counsel's litigation expenses, including detailed invoice and payment records, upon request by the Court.

**Class Representative's Service Award**

71.     The Class Representative devoted resources and energy to litigating and settling this Action. He provided information to Class Counsel that informed the class action complaints, and throughout the litigation, regularly communicated with Class Counsel about strategy and major case developments. *See* Ex. D. He also provided documents and information, including

17

information from his computer and FloSports and Facebook accounts, and was willing to present his devices to Class counsel for preservation and forensic imaging, if needed. *Id*. Moreover, he carefully reviewed and considered the Settlement, and consulted with Class Counsel, before approving it. *Id*. In light of his work, the requested service award of $2,000 is eminently reasonable.

We declare under penalty of perjury of the laws of the United States that the foregoing is true and correct.

Executed on this 6th day of December, 2023, at Brooklyn, New York, and Little Rock, Arkansas.

By: */s/ Rachel Geman*                By: */s/ Hank Bates*
      Rachel J. Geman                           Hank Bates